[Cite as *State ex rel. Demellweek v. Indus. Comm.*, 2018-Ohio-714.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Robert Demellweek, | : | |
| Relator, | : | |
| v. | : | No. 16AP-874 |
| Industrial Commission of Ohio and Lowe's Home Centers, LLC, | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

D E C I S I O N

Rendered on February 27, 2018

**On brief:** *Siferd & McCluskey, LPA, Lisa Bradley* and *Richard E. Siferd*, for relator.

**On brief:** *Michael DeWine,* Attorney General, and *Natalie J. Tackett*, for respondent Industrial Commission of Ohio.

**On brief:** *Kastner Westman & Wilkins, LLC, Michael J. Spisak* and *Catherine R. Gambill*, for respondent Lowe's Home Centers, LLC.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

TYACK, J.

{¶ 1} Robert Demellweek filed this action in mandamus seeking a writ to compel the Industrial Commission of Ohio ("commission") to overturn its finding that Demellweek was not entitled to temporary total disability ("TTD") compensation because of a voluntary abandonment of his employment with Lowe's Home Centers, LLC ("Lowe's").

{¶ 2} In accord with Loc.R. 13(M) of the Tenth District Court of Appeals, the case was referred to a magistrate to conduct appropriate proceedings. The parties stipulated

the pertinent evidence and filed briefs. The magistrate then issued a magistrate's decision, appended hereto, which contains detailed findings of fact and conclusions of law. The magistrate's decision includes a recommendation that we grant a writ compelling the commission to vacate its order denying TTD compensation for Demellweek based on voluntary abandonment of employment and to conduct additional proceedings to determine if he otherwise is entitled to TTD compensation.

{¶ 3} Counsel for Lowe's has filed objections to the magistrate's decision. Counsel for the commission has also filed objections to the magistrate's decision. Counsel for Demellweek has filed a memorandum in response. The case is now before the court for a full, independent review.

{¶ 4} Demellweek was injured on October 31, 2015 while he was working for Lowe's, who is a self-insured employer. His workers' compensation claim has been recognized for "right shoulder sprain; right forearm injury due to overuse; right shoulder superior labrum anterior posterior (SLAP) lesion."

{¶ 5} When hired, employees of Lowe's are provided a document of over 50 pages which is meant to guide their job activities. Apparently Demellweek received the document at some point in time. He signed an acknowledgement of receiving the document.

{¶ 6} Over five months after he was injured, Demellweek was fired for operating an order picker while not wearing a harness and tether. Over one month later yet, Demellweek applied for TTD compensation.

{¶ 7} Following a hearing before a district hearing officer ("DHO") of the commission, the TTD compensation was granted. The DHO rejected the argument on behalf of Lowe's that Demellweek had voluntarily abandoned his employment with Lowe's.

{¶ 8} On June 1, 2016, Demellweek had surgery on his injured right shoulder.

{¶ 9} Counsel for Lowe's appealed the order of the DHO granting TTD compensation. A staff hearing officer ("SHO") reviewed the situation and reached a different conclusion. Summaries of the orders of the DHO and SHO are contained in our magistrate's decision. Parts of the document from Lowe's, now frequently referred to as an employee handbook, are also in the magistrate's decision, specifically HR policy 315.

{¶ 10} The understanding of a Class "A" violation is critical to this case. As noted in our magistrate's decision, Class "A" violations include the most serious misconduct and repeated job performance problems. These serious violations normally will result in immediate discharge. The magistrate concluded the handbook gave Lowe's discretion to treat the violation as Class "A" or Class "B." They treated it as Class "A" without explanation, evading review.

{¶ 11} Demellweek was accused of using a picker only a matter of inches off the ground. This is no indication he endangered himself or others by not wearing a harness or tether under the circumstances. There is no indication that he did this on a regular or frequent basis. There are no claims he had been disciplined for this or any related conduct before.

{¶ 12} Nothing in the record before us indicates that Demellweek was on notice that operating a picker a few inches off the ground was conduct which would warrant immediate firing. This case is not like the early abandonment of employment cases which involved situations in which employees comes to work drunk or stoned and therefore were on notice they could or would be immediately fired. This is not a case where Demellweek was endangering himself or others. This is a case where a worker violated one provision in a handbook of over 50 pages.

{¶ 13} Voluntary abandonment of employment still is a doctrine that bars receipt of TTD compensation in a situation where an employee has to be on notice that his or her conduct can be expected to get him or her fired and then the employee chooses to engage in the conduct anyway. Voluntary abandonment of employment is not meant to be a vehicle which allows a self-insured employer to rid itself of injured workers for a minor violation of a work rule, written or not.

{¶ 14} We overrule the objections to the magistrate's decision. We adopt the findings of fact in the magistrate's decision except the inaccurate indication that the DHO failed to grant TTD compensation. We also adopt the conclusions of law in the magistrate's decision as amplified herein. We grant a writ of mandamus ordering the commission to vacate the October 4, 2016 order of its SHO and to issue a new order that determines the merits of Demellweek's June 21, 2016 motion for TTD compensation absent a finding that Demellweek voluntarily abandoned his employment.

*Objections overruled; writ of mandamus granted.*

BROWN, P.J., concurs in judgment only
DORRIAN, J., concurs in judgment only.

DORRIAN, J., concurring in judgment only.

{¶ 15} I concur in judgment only. On the facts of the case, given the evidence regarding the practice, customs and usage of the picker device, as well as the common sense and good judgment standard of conduct incorporated into the HR policies, I would find *State ex rel. Louisiana-Pacific, Corp. v. Indus. Comm.*, 72 Ohio St.3d 401 (1995), criteria was not met even when considering the HR Policy 315 categories.

————————

# A P P E N D I X

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Robert Demellweek, | : | |
| Relator, | : | |
| v. | : | No. 16AP-874 |
| Industrial Commission of Ohio and | : | (REGULAR CALENDAR) |
| Lowe's Home Centers, LLC, | : | |
| Respondents. | : | |

## M A G I S T R A T E ' S   D E C I S I O N

Rendered on August 7, 2017

*Siferd & McCluskey, LPA, Richard E. Siferd,* and *Lisa R. Bradley,* for relator.

*Michael DeWine*, Attorney General, and *Natalie J. Tackett,* for respondent Industrial Commission of Ohio.

*Kastner Westman & Wilkins, LLC,* and *R. Clint Zollinger,* for respondent Lowe's Home Centers, LLC.

IN MANDAMUS

{¶ 16} In this original action, relator, Robert Demellweek, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate the October 4, 2016 order of its staff hearing officer ("SHO") that denies relator's June 21, 2016 motion for temporary total disability ("TTD") compensation starting June 1, 2016 on grounds that relator voluntarily abandoned his employment with respondent, Lowe's Home Centers, LLC, and to enter an order awarding TTD compensation.

Findings of Fact:

{¶ 17}  1. On October 31, 2015, relator injured his right shoulder and forearm while employed with respondent, Lowe's Home Centers, LLC ("Lowe's"), a self-insured employer under Ohio's workers' compensation laws.

{¶ 18}  2. The industrial claim (No. 15-854338) is allowed for "right shoulder sprain; right forearm injury due to overuse; right shoulder superior labrum anterior posterior (SLAP) lesion."

{¶ 19}  3. Earlier, on February 10, 2015, relator signed a three-page document prepared by Lowe's captioned "Key Responsibilities Guide."  At the top of the first page, the document indicates that it is regarding "Job Title: Delivery Driver."

{¶ 20}  Thereunder, under the caption "Key Responsibilities," 28 unenumerated items are listed.  For example, the first item reads: "Secures truck contents before operating vehicle."

{¶ 21}  Thereunder, under the caption "Physical Requirements," 13 unenumerated items are listed.  For example, the first item reads: "Safety Harness:  The ability to wear the safety harness to perform job functions."

{¶ 22}  At page three of the document, the following pre-printed "Acknowledgment" is printed above a signature line for the "Applicant/Associate."

> *I acknowledge that I have read the Job Description and Key Responsibilities Guide and I understand what would be expected of me. The Company reserves the right to change or reassign job duties or to combine positions at any time. I also understand that I am an at-will employee, and the Job Description and Key Responsibilities Guide do not constitute a contract of employment.*

(Emphasis sic.)  Apparently, relator signed the above acknowledgment on February 10, 2015.

{¶ 23}  4. The stipulation of evidence filed by the parties on February 17, 2017 presents a multipage Lowe's document beginning at page 12of the stipulation and ending at page 40 of the stipulation.  The pagination of this document is approximately 58 pages, including a 2-page appendix.  The district hearing officer ("DHO") refers to this document as the "Employer's Handbook" or the "Employee Manual."   The SHO refers to this

document as the "guide." In its brief, Lowe's refers to this document as the "Guide." (Lowe's Brief at 13.) In its brief, the commission refers to the document as "Lowe's employee handbook." (Commission Brief at 15.) In its brief, the commission also refers to the document as simply the "handbook." *Id.* In his brief, relator refers to the document as the "handbook." (Relator's Brief at ix.)

{¶ 24} 5. On the first page or cover page of the approximate 58 page document, Lowe's states: "New employees are to keep this guide in their apron or vest pocket during their first 30 days of employment."

{¶ 25} 6. Cleary, on careful examination of the three-page document prepared by Lowe's and captioned "Key Responsibilities Guide" and relator's acknowledgment on the third page, there is nothing to suggest that relator acknowledged receipt of the so-called handbook when he signed the acknowledgment on February 10, 2015.

{¶ 26} 7. However, in his brief, relator, through counsel, refers to "a 58 page handbook given to Demellweek when he was hired." (Relator's Brief at ix.)

{¶ 27} 8. In its brief, the commission, through counsel, states:

> He signed his name acknowledging receipt of the handbook and policies. His signature also acknowledged that he had read the handbook and that he was willing to follow those policies as a condition of his employment by Lowe's. * * *
>
> Demellweek had been provided Lowe's work rules and knew the consequences of violation of Lowe's safety rules. * * * As of February 10, 2015, Demellweek had possession of Lowe's employee handbook.

(Commission's Brief at 15.)

{¶ 28} 9. The magistrate disagrees with the commission's assertion that relator acknowledged receipt of the handbook and that he had read the handbook when he signed the acknowledgment on page three of the Lowe's document captioned "Key Responsibilities Guide."

{¶ 29} 10. Notwithstanding the magistrate's disagreement with the commission's assertion regarding the scope of relator's February 10, 2015 acknowledgment, it appears that relator concedes that he received the handbook when he was hired.

{¶ 30} 11. On April 18, 2016, Lowe's management completed a Lowe's form captioned "Employee Corrective Action Report." On the form, Lowe's indicated that

relator's employment was terminated. On the form, Lowe's responded to several pre-printed queries:

> Describe the conduct/performance (who, what, when, why, where and how): On the morning of April 11, 2015 [sic], this associated [sic] was observed by several associates and he also admitted to operating the order picker without a harness and tether on.
>
> Expectations (what is expected in the future? Include follow-up dates):
>
> This associates [sic] is being terminated for a class A safety violation.

{¶ 31} 12. Relator refused to sign the completed form.

{¶ 32} 13. The parties stipulate that the "Employee Corrective Action Report" incorrectly states the date of the alleged violation. The date of the alleged violation is April 11, 2016. See supplemental stipulation of evidence filed on July 21, 2017.

{¶ 33} 14. On June 1, 2016, treating physician Robert J. Nowinski, D.O., completed a form prepared by the Ohio Bureau of Workers' Compensation ("bureau") captioned "Physician's Report of Work Ability." The bureau designates the form as a "Medco-14." On the Medco-14, Dr. Nowinski certified that, effective June 1, 2016, relator cannot return to his former position of employment. On the form, Dr. Nowinski estimated that relator should be able to return to the job held on the date of injury on September 5, 2016.

{¶ 34} 15. On June 14, 2016, Dr. Nowinski completed a bureau form captioned "Request for Temporary Total Compensation." The bureau designates the form as a C-84.

{¶ 35} 16. On June 21, 2016, on form C-86, relator moved for the payment of TTD compensation starting June 1, 2016. In support, relator submitted the June 1, 2016 Medco-14 from Dr. Nowinski and the June 14, 2016 C-84 from Dr. Nowinski.

{¶ 36} 17. Following an August 18, 2016 hearing, a DHO issued an order denying relator's request for TTD compensation. Citing *State ex rel. Louisiana-Pacific Corp. v. Indus. Comm.*, 72 Ohio St.3d 401 (1995), the DHO held that relator had not voluntarily abandoned his employment with Lowe's when he was terminated for violation of a safety rule. The DHO's order explains:

It is the order of the District Hearing Officer that the C-86 Motion filed by Injured Worker on 06/21/2016 is granted as provided by this order. Pay temporary total 06/01/2016 through 09/05/2016 less any days worked.

The parties stipulate to the following facts in this case. Injured Worker sustained an injury to the right shoulder on or about 10/31/2015. On 06/01/2016 the Injured Worker underwent a related surgery to the right shoulder which was approved by the Self-Insured Employer.

The Employer offers a *Louisiana-Pacific v. Industrial Commission* defense to the payment of benefits. This defense is based upon post injury conduct occurring on 04/11/2015 [sic].

On 04/11/2015 [sic], the Injured Worker was using a picker and per his own admission was not using a safety belt.

A review of the Employer's handbook, specifically pages 22 and 25 indicate that a Class A Safety Violation occurs when an Injured Worker uses a picker device without a safety harness. The written Employee Manual indicates that this [is] a dischargeable offense and for this reason the Employer seeks *Louisiana-Pacific* protection against paying further temporary benefits.

The Injured Worker offers extensive testimony concerning the practice and application of using a picker as well as a specific events of 04/11/2015 [sic]. The Injured Worker testifies that the picker he was using on 04/11/2015 [sic] was at a very low height. Moreover, it is indicated that the safety belts offered no additional protection from injury based upon a fall of limited height which was the case on 04/11/2015 [sic].

Moreover, the Injured Worker testified that this rule was widely ignored, particular[ly] when the safety belts in question offered no additional protection from injury. The Injured Worker testified that he had seen supervisory personnel using the picker without a safety belt.

The *Louisiana-Pacific* case requires that an Injured Worker violate a written work rule of clearly prohibiting conduct. It must also be clear that the conduct could result in a termination from employment. This Hearing Officer concludes that the unrebutted testimony of the Injured

Worker strongly suggest[s] that the consequence of this prohibited conduct was obscured by the practice, customs and usage of the picker device as described by the Injured Worker.

It is also noted that the Employee Handbook outlines a standard of conduct which makes reference to common sense and good judgment. If the use of the safety belt in question offered no additional protection the Hearing Officer feels that the Injured Worker could have reasonably concluded that this was not a prohibited conduct in the consequence of a discharge was obscured by the usage and practice. [sic]

The Hearing Officer relies upon the Injured Worker's testimony as indicated above. The Hearing Officer also relies upon the MEDCO-14 Physician's Report of Work Ability filed 06/01/2016 authored by Robert J. Nowinski. The Hearing Officer also relies on the C-84 dated 06/14/2016.

{¶ 37} 17. Lowe's administratively appealed the DHO's order of August 18, 2016.

{¶ 38} 18. Following an October 4, 2016 hearing, an SHO issued an order that vacates the DHO order of August 18, 2016 and determines the request for TTD compensation. The DHO's order explains:

This Hearing Officer denies payment of temporary total disability compensation from 06/01/2016 to present, 10/04/2016.

Consistent with *Louisiana-Pacific* this Hearing Officer finds payment of temporary total disability compensation is precluded as a result of the Injured Worker's voluntary abandonment of his employment. Under *Louisiana-Pacific*, an Injured Worker's termination from his employment is voluntary when it is generated by an Injured Worker's violation of a written work rule that (1) clearly defines the prohibited conduct (2) had been previously identified by the Employer as a dischargeable offense and (3) was known or should have been known to the employee. This Hearing Officer finds on 04/18/2016, the Injured Worker was terminated for a class A safety violation. The Injured Worker had been observed by several associates operating an order picker without the use of a harness and tether. The Injured Worker admitted to his Employer as well as admitted at hearing that he operated the picker without a harness and tether. However, he testified that the picker was only a few

inches off of the ground and the safety harness would not have protected him from injury. He also testified that other personnel have operated this piece of equipment without a safety harness and it was not an unusual practice. At hearing, the Human Resources Manager for Lowe's testified to the contrary.

This Hearing Officer finds the Injured Worker acknowledged by signature, on 02/10/2015, that he read the job description and key responsibilities guide and understood what was expected of him. This Hearing Officer finds this guide, under the section regarding standards of conduct, made reference to class (A) violations which were defined as actions which would normally subject an employee to immediate termination on the first occurrence. The list of class A violations included violations of safety rules or hazardous materials procedures. This Hearing Officer finds the safety rules listed under the loss prevention and safety section of this guide state "an order picker and lift truck cage requires you to wear a safety belt or harness and fall protection tether." "Make sure you're attached before using the equipment." This Hearing Officer finds there is no dispute that the Injured Worker violated this safety rule and this Hearing Officer finds it was the prerogative of the Employer to terminate the Injured Worker based upon his violation. In light of the aforementioned findings, this Hearing Officer finds payment of temporary total disability compensation is precluded based upon the Injured Worker's voluntary abandonment of his employment under *Louisiana-Pacific.*

{¶ 39} 19. On October 27, 2016, another SHO mailed an order refusing relator's appeal of the October 4, 2016 order of the SHO.

{¶ 40} 20. On December 3, 2016, the three-member commission mailed an order denying relator's November 15, 2016 request for reconsideration.

{¶ 41} 21. As earlier noted, the stipulation of evidence filed by the parties on February 17, 2017 presents a multipage Lowe's document beginning at page 12and ending at page 40 of the stipulation. The actual pagination of this document runs approximately 58 pages as each page of the stipulation presents 2 pages from the document. The magistrate shall refer to this document as the Lowe's handbook.

{¶ 42} The Lowe's handbook presents 32 unenumerated sections containing a caption. Relevant here is a section captioned "Standards of Conduct" and a subsequent section captioned "Loss Prevention and Safety."

{¶ 43} Under the caption "Standards of Conduct," the handbook provides:

> In your day-to-day conduct at Lowe's, you will be expected to use common sense and good judgment. We believe most employees know what behavior is acceptable in the work environment and what is not. Certain kinds of actions or conduct are obviously unacceptable, but no list of standards can possibly cover every circumstance.
>
> HR Policy 315 identifies three categories of unacceptable performance or conduct. Examples of violations in the respective categories are listed in the policy quoted below; however, the examples show the relative severity of violations and are not intended to and do not identify all possible violations.
>
> **Class "A"** includes the most serious misconduct and repeated job performance problems. These serious violations normally will result in immediate discharge.
>
> **Class "B"** includes serious acts, which indicate a disregard of, established rules and/or standards of conduct but are not so serious as to compel immediate termination. Class "B" violations will normally result in a written warning for a first offense, final warning for a second offense and termination for a subsequent offense. Depending upon the severity of the infraction or past work history, termination may be appropriate for the first offense. An employee may commit multiple Class "B" violations that are not serious when considered separately, but when grouped together indicate a pattern of unacceptable behavior. In such cases, management should consider multiple Class "B" violations committed in a short period of time as grounds for more serious corrective action, up to and including termination.
>
> **Class "C"** generally results in an initial warning. However, an employee may commit multiple Class "C" violations that, when considered together, are grounds for more serious corrective action up to and including termination.
>
> The following categorization is suggested for some of the more frequent types of violations. If, because of other circumstances, the manager feels that the suggested category

and accompanying discipline are not appropriate, the manager should normally discuss it with his/her immediate supervisor and the appropriate Human Resources Manager before discipline is administered to an employee.

**Class A, B and C- Examples**

**A. Class "A" Violations**
The following violations are examples of actions, which will normally subject an employee to immediate termination on the first occurrence: This list is not intended to identify all possible violations.

* * *

[Twenty-three] Violations of safety rules or hazardous materials procedures.

* * *

**B. Class "B" Violations**
The following violations are examples of actions, which normally will subject an employee to a written warning for a first offense, a final warning for a second offense and termination for a subsequent offense. Depending on the severity of the violation, a final warning may be given rather than a written warning. (While termination is normally not appropriate for a first offense, it is possible, particularly if the employee's length of service is short or their overall work record is considered less than acceptable.)

Normally, offenses occurring outside the immediately preceding 12-month period will not be counted for this purpose.

* * *

[Eight] Working in an unsafe manner.

(Emphasis sic.)

{¶ 44} Under the caption "Loss Prevention and Safety[;] Safety First," the handbook provides:

Safety procedures are usually common sense, but common sense sometime causes us to touch wet paint. Procedures are in place to help provide a safe and health[y] work place for

you, our customers and fellow employees. Disregarding safety rules is serious business. When a rule is broken, a Lowe's employee or customer may be put in danger. For that reason, violations of safety rules could be grounds for immediate termination. If you do not know the safety requirements of your job—ask!

* * *

**Safety Rules**
Here are some of the common safety rules to be followed at Lowe's:

* * *

An order picker and lift truck cage requires you to wear a safety belt or harness and fall protection tether. Make sure you're "attached" before using the equipment.

* * *

When working "inside" or "on" shelving units over four feet from the ground, you must have a safety belt or harness and tether attached to the lift or shelving unit.

(Emphasis sic.)

{¶ 45} 22. On December 22, 2016, relator, Robert Demellweek, filed this mandamus action.

Conclusions of Law:

{¶ 46} Several issues are presented: (1) did the commission abuse its discretion in failing to determine whether or not the "order picker" was elevated when it was used by relator on April 11, 2016, and (2) did the commission abuse its discretion by accepting Lowe's determination that the safety violation was a class A violation rather than a class B violation?

{¶ 47} The magistrate finds: (1) the commission did not abuse its discretion in failing to determine whether or not the "order picker" was elevated when it was used by relator on April 11, 2016, and (2) the commission abused its discretion by accepting Lowe's determination that the safety rule violation was a class A violation.

{¶ 48} Accordingly, it is the magistrate's decision that this court grant relator's request for a writ of mandamus, as more fully explained below.

**Basic Law: Work Rule Violation Resulting in Termination of Employment**

{¶ 49} *Louisiana-Pacific* is the seminal case regarding work rule violations resulting in termination of employment.

{¶ 50} In *Louisiana-Pacific*, the court held that a claimant can voluntarily abandon his employment and, thus lose eligibility for TTD compensation when he is terminated by his employer for violation of a written work rule. The court set forth a three-part test which it described:

> [W]e find it difficult to characterize as "involuntary" a termination generated by the claimant's violation of a written work rule or policy that (1) clearly defined the prohibited conduct, (2) had been previously identified by the employer as a dischargeable offense, and (3) was known or should have been known to the employee. Defining such an employment separation as voluntary comports with [*State ex rel. Ashcraft v. Indus. Comm.* (1987), 34 Ohio St.3d 42, and *State ex rel. Watts v. Schottenstein Stores Corp.* (1993), 68 Ohio St.3d 118, 121] -- i.e., that an employee must be presumed to intend the consequences of his or her voluntary acts.

*Id.* at 403.

{¶ 51} In *State ex rel. McKnabb v. Indus. Comm.*, 92 Ohio St.3d 559, 561 (2001), the court had occasion to clarify the three-part test of *Louisiana-Pacific*:

> Now at issue is Louisiana-Pacific's reference to a written rule or policy. Claimant considers a *written* policy to be an absolute prerequisite to precluding TTC. The commission disagrees, characterizing Louisiana-Pacific's language as merely illustrative of a TTC-preclusive firing. We favor claimant's position.
>
> The commission believes that there are common-sense infractions that need not be reduced to writing in order to foreclose TTC if violation triggers termination. This argument, however, contemplates only some of the considerations. Written rules do more than just define prohibited conduct. They set forth a standard of enforcement as well. Verbal rules can be selectively enforced. Written policies help prevent arbitrary sanctions and are particularly

important when dealing with employment terminations that may block eligibility for certain benefits.

*Id.* at 561.

## First Issue: Elevation of the Order Picker

{¶ 52} As indicated in the SHO's order of October 4, 2016, relator admitted to his employer and at the hearing that he operated the picker without a harness and tether. However, relator testified that "the picker was only a few inches off the ground and the safety harness would not have protected him from injury." It can be further noted that the DHO's order of August 18, 2016 states that relator testified that the picker he used on April 11, 2016 "was at a very low height." It can be further noted that Lowe's submitted no evidence to contradict relator's testimony regarding elevation of the picker.

{¶ 53} As relator correctly points out, the SHO's order of October 4, 2016 fails to determine whether or not the order picker was elevated (or the extent of the elevation) when relator used the picker on April 11, 2016. Lowe's and the commission argue that the elevation of the picker on April 11, 2016 is irrelevant and, thus the SHO was not required to make a finding regarding the elevation. The magistrate agrees with Lowe's and the commission on this point.

{¶ 54} Again, the safety rule at issue states:

An order picker and lift truck cage requires you to wear a safety belt or harness and fall protection tether. Make sure you're "attached" before using the equipment.

Again, a subsequent safety rule states:

When working "inside" or "on" shelving units over four feet from the ground, you must have a safety belt or harness and tether attached to the lift or shelving unit.

{¶ 55} Here, relator seems to suggest that because the latter safety rule, by its terms, pertains to shelving units over four feet from the ground, the former rule must provide a similar height requirement. Relator is incorrect.

{¶ 56} The commission has no authority to rewrite the order picker safety rule so that some measure of elevation was required. A plain reading of the safety rule indicates that use of the order picker without a harness and tether is prohibited at any elevation.

{¶ 57} It is the employer's prerogative to write its own safety rules and to require its employees to follow them. It is not the duty of this court to second-guess the wisdom or effectiveness of the safety rule as written.

{¶ 58} Thus, the magistrate concludes that the commission did not abuse its discretion in failing to determine whether or not the order picker was elevated when it was being used by relator on April 11, 2016.

### Second Issue: Class A versus Class B Violations

{¶ 59} Under "Standards of Conduct," the handbook lists 24 violations that will "normally" subject an employee to immediate termination on the first occurrence. These are examples of class A violations. The 23rd violation on the list is "violations of safety rules or hazardous materials procedures."

{¶ 60} Also under "Standards of Conduct," the handbook lists 11 violations that will "normally" subject an employee to a written warning for a first offense. The eighth violation on the list is "working in an unsafe manner." These are examples of class B violations.

{¶ 61} Under "Loss Prevention and Safety," the handbook sets forth the safety rule at issue, i.e., the rule regarding use of the order picker. Also, prefacing the safety rule regarding the order picker, the following warning is given under "Loss Prevention and Safety:"

> Disregarding safety rules is serious business. When a rule is broken, a Lowe's employee or customer may be put in danger. For that reason, violations of safety rules could be grounds for immediate termination.

{¶ 62} Given the above, the magistrate concludes that the handbook, by its own terms, gave Lowe's the discretion to treat the order picker violation as either a class A or class B violation. Lowe's management decided to treat the order picker violation as a class A violation that subjected relator to immediate termination.

{¶ 63} Significantly, Lowe's provided the commission with no explanation or supporting documentation to justify treating the order picker violation as a class A violation rather than a class B violation.

{¶ 64} As relator points out, Lowe's "Employee Corrective Action Report," dated April 18, 2016, fails to indicate that relator had any prior violations of the safety rules. And while the order picker safety rule does not require elevation for the rule to apply, clearly, common sense would dictate that a highly elevated order picker would present more danger than an unelevated one.

{¶ 65} Accepting Lowe's decision to treat the alleged April 11, 2016 violation as a class A violation rather than a class B violation without an explanation from Lowe's and supporting evidence, potentially sanctions an arbitrary decision. Also, the lack of an explanation renders this court unable to review Lowe's decision to treat the alleged violation as a class A violation.

{¶ 67} Because there was no evidence in the record before the commission on which the SHO could determine that treatment of the April 11, 2016 alleged violation as a class A violation was justified, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate the October 4, 2016 order of its SHO and to issue a new order that determines the merits of relator's June 21, 2016 motion for TTD compensation absent a finding that relator voluntarily abandoned his employment.

/S/ MAGISTRATE
KENNETH W. MACKE

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).